**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | | |
|---|---|---|
| DAVID JEAN-BAPTISTE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:04 CV 739 |
| | ) | |
| K-Z, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND OPINION

In this civil action for monetary damages, plaintiff David Jean-Baptiste ("Jean-Baptiste") claims that his former employer, defendant K-Z, Inc. ("K-Z") is liable for discriminatory discharge and harassment based on race and national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"). K-Z moves for summary judgment on both claims. In addition, K-Z moves to strike portions of Jean-Baptiste's LOCAL R. 56.1(a) statement of genuine issues and the corresponding exhibits. For the reasons set forth below, K-Z's motion to strike and motion for summary judgment are both denied.

## I. BACKGROUND

David Jean-Baptiste ("Jean-Baptiste"), a resident of Elkhart County, Indiana, is a thirty-six year old black Haitian male. (Jean-Baptiste Dep., Def.'s Mot. Summ. J., docket # 21, Ex. 8, at 5, 19-22, 33.) K-Z, Inc. ("K-Z") manufactures recreational vehicles at its plant in LaGrange County, Indiana. (Def.'s Answer, docket # 8, ¶¶ 3, 10.) On March 26,

2004, K-Z hired Jean-Baptiste as a permanent employee in its lamination department. (Jean-Baptiste Dep. 35.) About 21 days later, on April 20, 2004, K-Z fired Jean-Baptiste. (Miller Aff., Def.'s Mot. Summ. J., docket # 21, Ex. 3, ¶ 11.)

On his first day at work, Jean-Baptiste received K-Z's employee handbook, which provides that "[t]he first 30 days of employment are considered an orientation period," and "if you are not making satisfactory progress, you may be terminated at any time during this orientation period." (K-Z Employee Handbook, Def.'s Mot. Summ. J., docket # 21, Ex. 10, at 4; Receipt for Employee Handbook, Def.'s Mot. Summ. J., docket # 21, Ex. 11.) Jean-Baptiste alleges he received no orientation or training, nor was he introduced to his co-workers. (Jean-Baptiste Dep. 49, 55.) K-Z contends that like any new employee, Jean-Baptiste was provided a brief orientation and then placed in a team with experienced workers, who trained him. (Helvey Dep., Def.'s Mot. Summ. J., docket # 21, Ex. 6, at 47-49.)

Jean-Baptiste's duties primarily consisted of making complete side walls for recreational vehicles. (Helvey Dep. 67.) The work environment was fast-paced (Jean-Baptiste Dep. 68-69) and the work space cramped, with employees bumping into each other often. (Helvey Dep. 66.) Jean-Baptiste's group leader was Jason Helmuth, his supervisor was Michael Helvey, and his department head was Darrell Zook. The plant manager was Elvey Miller. (Jean-Baptiste Dep. 44; Helvey Dep. 32.)

On his first day at work, while he was bending over to pick up something, Wayne Miller, a co-worker in his work group, passed wind on his face and said, "That's

not your place. You shouldn't be here anyway." (Jean-Baptiste Dep. 56-57, 59-60.) Jean-Baptiste testified that he complained to his immediate supervisor, Michael Helvey, who turned his back on him and would not listen. (Jean-Baptiste Dep. 61.) From that day, Jean-Baptiste says, his co-workers often looked at him in a "funny" way and laughed at him. (Jean-Baptiste Dep. 53-54, 56.) In addition, co-workers never spoke to him at work, despite his attempts to converse with them. (Jean-Baptiste Dep. 42-43.)

During Jean-Baptiste's second week at K-Z, another co-worker, David Garcia, came up to him, jabbed a finger two inches away from his face, and said, "Black people so stupid, you can't do your job." (Jean-Baptiste Dep. 63.) For the next ten business days leading up to the day he was fired, Jean-Baptiste alleges that Garcia called him names such as "Haitian," "stupid," "Haitian people took boat [sic] to come to United States to find food," "black," "black people stink," "go home black man," and "we don't want you around here because you're black." (Jean-Baptiste Dep. 58, 70-71.) In addition, on at least three occasions, Garcia allegedly dropped work product on Jean-Baptiste, or hit him with his elbow, but immediately apologized to him afterwards. (Jean-Baptiste Dep. 75, 78.) Jean-Baptiste believes Garcia acted on purpose. (Jean-Baptiste Dep. 75, 78.) He also testified that he felt physically threatened by the incident (Jean-Baptiste Dep. 75.) Upset and angry, Jean-Baptiste again tried to complain to his supervisor, Helvey, only to see Helvey turn his back and walk away. (Jean-Baptiste Dep. 67-68.) Helvey denies ever turning his back on Jean-Baptiste when he tried to talk to him. (Helvey Dep. 28-29.)

Garcia denies making any remarks related to race or national origin to Jean-Baptiste. (Garcia Aff., Def.'s Mot. Summ. J., docket # 21, Ex. 4, ¶ 9.)

K-Z's employee handbook sets forth a reporting mechanism for channeling harassment complaints from employees. It states, in pertinent part:

> Any K-Z person who experiences or observes conduct believed to constitute harassment in violation of this policy should tell the harasser that the behavior is offensive and that it must stop. If you are unable or uncomfortable confronting the harasser or unsuccessful in convincing him or her to stop, immediately report the incident to your Plant Manager, the Compliance Manager or the Human Resource Manager so the incident may be fairly investigated and any prompt remedial action may be taken.

(K-Z Employee Handbook 12.) Jean-Baptiste admits he did not complain about these incidents to any of the three "point persons" designated by K-Z to receive harassment complaints - Elvey Miller, the Plant Manager; Sue Thomas, the Human Resource Manager; or Delbert Miller, the Compliance Manager – about the alleged harassment before he was discharged on April 20, 2004 (Jean-Baptiste Dep. 81, 84), but, as stated previously, Jean-Baptiste does maintain that he complained to Helvey, who turned his back in response. (Jean-Baptiste Dep. 61, 67-68.)

Jean-Baptiste testified that no other co-worker except Garcia uttered racial epithets or national origin slurs at him. (Jean-Baptiste Dep. 71.) Nor does he allege that his supervisor, Helvey, or group leader, Jason Helmuth, ever made derogatory remarks based on race or national origin to him. (Compl., docket # 1, at 2-5.) In his deposition, Helmuth admitted that he and other employees in his group often told and tolerated jokes based on race and national origin, such as "black jokes . . . Mexican jokes . . .

Amish jokes . . . Polish jokes" in the workplace. (Helmuth Dep., Def.'s Mot. Summ. J., docket # 21, Ex. 7, at 17-18.) Helmuth testified that joke-telling has prevailed in the workplace since early 2002, when he started working for K-Z. However, neither in his complaint nor in his deposition did Jean-Baptiste allude to hearing or being made the subject of joke-telling in the workplace.

K-Z alleges that by the second week of his employment, Jean-Baptiste's performance had deteriorated. (Helvey Dep. 41.) Jean-Baptiste's supervisor, Mike Helvey, testified that initially, he was impressed by Jean-Baptiste's persistence because he had pestered Helvey for a job at K-Z for months. (Helvey Dep. 38.) Eventually, Helvey hired him. (Helvey Dep. 38.) Jean-Baptiste seemed qualified for the position because he had prior lamination experience in a recreational vehicle manufacturing facility. (Helvey Dep. 39.) In addition, Jean-Baptiste testified he could read blueprints. (Jean-Baptiste Dep. 132.) But Helvey contends that Jean-Baptiste began making mistakes on the job from his first day at K-Z. (Helvey Dep. 54.) He also seemed to have trouble reading blueprints. (Helmuth Dep. 13.) Helvey said that while he was not surprised that Jean-Baptiste initially made mistakes, he also expected him to correct those mistakes and improve. Helvey held a supervisory meeting and gave Jean-Baptiste a verbal warning to improve his work performance. (Helvey Dep. 29.) Specifically, Helvey identified four specific aspects of Jean-Baptiste's work performance that needed improvement: inadequate work output, inability to follow directions, unwillingness to perform all duties, and poor work quality. (Miller Aff. ¶ 9; Helvey Dep. 29; Helmuth

Dep. 10-17, 21-25.) In addition to Jean-Baptiste, Helvey also verbally warned another worker, Wayne Miller, to improve his work performance in one specific area: inadequate work output. (Helvey Dep. 34.)

K-Z maintains that it has no documentation of Helvey's April 8, 2004, supervisory meeting. (Def.'s Resp. to Pl.'s Req. for Produc. Docs., Pl.'s Resp. to Def.'s Mot. Summ. J., docket # 22-7, ¶ 3.) However, in his deposition, Helvey recalled having made notes of the meeting in a notebook, which he said he would give K-Z's attorney. (Helvey Dep. 34.) The record does not reveal whether Helvey does in fact have the alleged notebook, nor whether he gave it to K-Z's attorney.

K-Z alleges that by April 20, 2004, Jean-Baptiste had not corrected his performance deficiencies, but Wayne Miller had. (Helvey Dep. 23, 35.) In addition, Chad Pearson, who had previously worked in K-Z's lamination department, but had been on workman's compensation leave, was scheduled to return to work on April 21, 2004. (Jean-Baptiste Dep. 87; Miller Aff. ¶ 9.) His return would leave the lamination department with one extra worker, forcing K-Z to discharge one worker to maintain its work strength. (Jean-Baptiste Dep. 87; Miller Aff. ¶ 9.) Helvey and Helmuth jointly decided to fire Jean-Baptiste because he was the worst performing worker in their department. (Helvey Dep. 56; Miller Aff. ¶ 10.) Finally, on April 20, 2004, Helvey fired Jean-Baptiste. According to Jean-Baptiste, before firing him, Helvey told Jean-Baptiste he was a good worker, but that he was letting Jean-Baptiste go to make way for Chad Pearson. (Jean-Baptiste Dep. 87-89.) Helvey admitted that K-Z did not hire employees to

replace employees who were away on workman's compensation leave. (Helvey Dep. 39.)

Jean-Baptiste testified that he was performing just fine and that K-Z's reasons for firing him were phony – a mask for intentional discrimination. Specifically, Jean-Baptiste contends that he knew what he was doing, that he kept pace with the work, and that he was performing all the functions of his job. (Jean-Baptiste Dep. 73.) Furthermore, Jean-Baptiste testified that Helvey repeatedly told him that he was doing "a good job . . . a fantastic job." (Jean-Baptiste Dep. 73.) Helmuth testified that Jean-Baptiste's attendance and punctuality were good, and his attitude towards Helmuth was also good. (Helmuth Dep. 8.) During Jean-Baptiste's employment at K-Z, Darrell Zook determined whether the lamination department was producing enough work. (Helvey Dep. 32.) Helvey testified that Zook never told him, during that time, that the lamination department was producing inadequate work output. (Helvey Dep. 32.)

Jean-Baptiste points to K-Z's allegedly favorable treatment of his former co-worker, Wayne Miller, to bolster his claim that he was discriminated against. According to Jean-Baptiste, Wayne was incompetent and did not know what he was doing. (Jean-Baptiste Dep. 74.) Jean-Baptiste testified that Wayne's father, who also worked in the lamination department, frequently left his workstation to help his son perform his job. (Jean-Baptiste Dep. 72.) Helmuth acknowledged that Wayne may have received help from his father, but contends that in the lamination department, experienced workers and supervisors routinely helped struggling co-workers keep up with the pace.

7

(Helmuth Dep. 16.) Helmuth also testified that in April 2005, about one year after Jean-Baptiste was fired, Wayne had a performance problem, but was given a second chance because Wayne resolved the problem on the same day. (Helmuth Dep. 7.)

The court now turns to the events that allegedly occurred after Jean-Baptiste was fired. Jean-Baptiste says he complained to Delbert Miller, K-Z's compliance manager, about racial and national origin harassment immediately after Helvey fired him, presumably on April 20, 2004. (Jean-Baptiste Dep. 84.) In response, Miller purportedly said something to the effect of "The way you telling me . . . that wasn't right. That's wrong." (Jean-Baptiste Dep. 91.) Miller, on the other hand, says he first met Jean-Baptiste on April 23, 2004, when Jean-Baptiste complained of unfairness on two grounds: (1) he was not told when he was hired that his job was temporary until Chad Pearson's return from workman's compensation leave; and (2) he had made every effort to rectify his performance deficiencies as identified by Helvey on April 8, 2004. (Miller Aff. ¶ 6.) Miller claims he spoke to the decision-makers about the grounds of Jean-Baptiste's discharge and, on April 27, 2004, he called Jean-Baptiste to tell him that the decision stood. (Miller Aff. ¶ 12.)

In an exit interview on April 22, 2004, two days after Jean-Baptiste's discharge, an employee in K-Z's human resources department asked him to fill out a questionnaire, which included several pertinent questions, such as: "Why are you leaving? Were you satisfied with your job? [Were you satisfied with] Supervision and Management? [Were you satisfied with] Company Policies & Practices? What do you

feel needs to be improved at the company? Were you treated fairly while with the company? If no, what was your complaint? Is there a problem that you know about or you have heard others talking about concerning the company? Must something change for you to come back?" (Exit Interview, Def.'s Mot. Summ. J., docket # 21, Ex. 12, at 1-2.) Jean-Baptiste did not answer a single question, except for checking "disagree" to the question "My reason for leaving the company has nothing to do with a work-related problem or grievance." (Exit Interview 1-2.) Jean-Baptiste explains that he did not fill out the exit interview questionnaire because he was upset and nervous after his sudden termination. (Jean-Baptiste Dep. 100, 134.)

Miller says Jean-Baptiste first complained of race and national origin discrimination and harassment to him on April 30, 2004. (Miller Aff. ¶ 14.) Miller avers he called Jean-Baptiste into his office to start an investigation. (Miller Aff. ¶ 14.) Miller says Jean-Baptiste refused to write down his allegations for him. (Miller Aff. ¶ 14.) Afterwards, Miller claims he investigated Jean-Baptiste's verbal allegations but found that no one had discriminated against him based on race or national origin. (Miller Aff. ¶ 14.) Miller told Jean-Baptiste about the result of his investigation on May 7, 2004.

On May 24, 2004, Jean-Baptiste filed a charge of discrimination based on race and national origin against K-Z with the Indiana Human Relations Commission. (HRC Intake Questionnaire, Def.'s Mot. Summ. J., docket # 21, Ex. 13.) Jean-Baptiste also filed a timely charge with the Equal Employment Opportunity Commission ("EEOC") on or about June 14, 2004. (EEOC Charge of Discrimination, Def.'s Mot. Summ. J., docket # 21,

Ex. 14.) The EEOC issued Jean-Baptiste a "notice of right to sue" on September 2, 2004. (Compl. ¶ 8.) Finally, Jean-Baptiste filed a complaint with this court on December 1, 2004, alleging race and national origin discrimination and harassment. (Compl. ¶¶ 4-5.)

## II. DEFENDANT'S MOTION TO STRIKE

K-Z seeks to strike portions of Jean-Baptiste's LOCAL R. 56.1(a) statement of genuine issues ("Plaintiff's Statement") and the corresponding exhibits on various evidentiary grounds. At the outset, the court notes that Plaintiff's Statement does not constitute evidence. Rather, through specific citations to the evidence, Plaintiff's Statement highlights facts that Jean-Baptiste believes are in dispute. K-Z has not cited to any authority to persuade the court that it is proper to strike such statements, and the court declines to do so. However, to the extent that K-Z claims that Jean-Baptiste mischaracterized evidence or misstated facts in Plaintiff's Statement, such is duly noted; the court does not consider Plaintiff's Statement to conclusively establish a fact merely because Jean-Baptiste states it. Instead, the court will allow the evidence to speak for itself. The court now addresses K-Z's motion only to the extent that it seeks to strike parts of affidavits and deposition testimony.

K-Z argues that Jean-Baptiste's assertions that he "knew" David Garcia *purposely* hit him with his elbow and dropped work product on him must be struck from the following two excerpts of Jean-Baptiste's deposition testimony:

*Excerpt One*

Q.  When did he threaten you with physical harm?
A.  Well, in uh, close to the third week . . . because he's the one who helped me out to hang those things. Sometime he drop it on purpose and sometime his elbow hit me so many time. He say, "Sorry." And I'm cool with that, because I'm not looking for trouble. And he kept doing it over and over again, and he said, "Sorry." And the third time, I said, "Hey, you do it on purpose. Don't tell me sorry all the time like that." He said, "No, David, I don't do it on purpose." I'm cool with that. I could work and do my job. So, every time he did something, he'd say, "Sorry." There was no way I'm gonna say, "Well, you did it on purpose." He said sorry. Sorry, is sorry.

(Jean-Baptiste Dep. 75.)

*Excerpt Two*

Q. So, he never threatened you with physical harm?
A. Like I said . . . [e]very time I'm working close to him, he hit me by his elbow, on purpose. He did it on the first time, and he said, "Sorry." I knew he did it on purpose, and he said, "Sorry." "Sorry." "Sorry." That's all fine.
Q. You knew he did on purpose, but you told me before you are not a mind reader, right . . . you can't read other people's minds?
A. No.
Q.  And you said that the times when he hit you with his elbow he apologized for it, is that right?
A. Correct. And he kept doing it, and don't do it only one time, he did it, like three times.

(Jean-Baptiste Dep. 77-78.) K-Z argues that Jean-Baptiste lacks competence and personal knowledge to "know" that Garcia's conduct was intentional, and that speculation as to an employer's state of mind is inappropriate. But Jean-Baptiste's testimony is admissible as an inference under FED. R. EVID. 701, which allows a lay witness to testify "in the form of opinions or inferences which are (a) rationally based on the perception

of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Jean-Baptiste did not simply make a conclusory statement about Garcia's state of mind. Indeed, he clarified in his testimony that he cannot read minds. Accordingly, the court admits those parts of his testimony in which he avers that he "knew" Garcia "did it on purpose" solely as a lay witness's inference based on his sense of sight, hearing, and touch, and a reasonably specific description of Garcia's actions.

K-Z also seeks to strike the following part of Jason Helmuth's deposition testimony:

> Q. Was anything done about Wayne Miller's performance problem that occurred about six months ago?
> A. As far we just had a meeting, you know, just had to get everybody to straighten up; be more careful.
> Q. So, he was given a second chance?
> A. Yeah.

(Helmuth Dep. 7.) K-Z argues that Wayne Miller getting a second chance about six months before Helmuth's deposition is irrelevant because the incident occurred about nine months *after* Jean-Baptiste's discharge. The court admits the testimony under FED. R. EVID. 401 because it is probative of whether K-Z treated non-black or non-Haitian employees who were similarly situated to Jean-Baptiste with regard to work performance more favorably than it treated Jean-Baptiste, and whether K-Z lied when it said that it treated all employees equally.

K-Z also argues that the following statements from Jean-Baptiste's deposition testimony must be struck because they are inadmissible hearsay under FED. R. EVID. 802: (1) "[Delbert Miller] said, 'The way you telling me, that wasn't right.' He said, 'That's wrong.'" (Jean-Baptiste Dep. 91); (2) "[Miller] said 'That was not right.' He said I was supposed to get my job back." (Jean-Baptiste Dep. 91); and (3) "[K-Z's attorney said] "Don't ever call [Miller]. He has nothing to do with that, and if you . . . keep calling him, you're gonna put yourself in trouble.'" (Jean-Baptiste Dep. 91.)

The court admits all three statements as admissions of a party opponent under FED. R. EVID. 801(d)(2)(D) because a statement offered against a party is not hearsay when made "by the party's agent or servant concerning a matter within the scope of the agency or employment . . . during the existence of the relationship." In employment discrimination cases,"the declarant must be involved in the decision making process affecting the employment action involved," through, for example, serving in management or some other personnel position. *See Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756, 762 (7th Cir. 2003). Here, Delbert Miller was K-Z's Compliance Manager, he was a key figure in events occurring immediately after Jean-Baptiste's discharge, and the statements are within the scope of his job description and were made when Miller was still employed by K-Z. Similarly, K-Z's attorney, as its agent, had the authority to make statements on behalf of K-Z, K-Z's attorney made the alleged threat while he was in K-Z's office, and the statement related to Jean-Baptiste, K-Z's former employee, who

was inquiring about the possibility of being rehired by K-Z, making the statement an action that falls within the scope of the attorney's agency.

For the reasons set forth above, defendant's motion to strike is denied. The court now considers the merits of defendant's motion for summary judgment.


## III. DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is proper where the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a reasonable jury to return a verdict for that party. *See Ajayi v. Aramark Bus. Services, Inc.*, 336 F.3d 520, 527 (7th Cir. 2003). The "very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." FED. R. CIV. P. 56(c) advisory committee's note to 1963 amend. Accordingly, FED. R. CIV. P. 56(c) requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial burden of identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with

the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (citing FED. R. CIV. P. 56(c)). Once the moving party meets its burden, the non-moving party cannot simply rely upon its pleadings, but must affirmatively set forth specific facts to show that a genuine issue of material fact exists. *Id.* at 324-25. In assessing whether the parties have met their respective burdens, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In short, in the employment discrimination context, summary judgment is warranted where "the evidence, interpreted favorably to the plaintiff, could [not] persuade a reasonable jury that the employer had discriminated against the plaintiff." *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1570 (7th Cir. 1989).

**B. Analysis**

*1. Discriminatory Discharge Claim*

Title VII forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [the individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e(2)(a). A plaintiff may prove employment discrimination under Title VII using either the "direct method" or the "indirect method." *See, e.g., Cerruti v. BASF Corp.*, 349 F.3d 1055, 1060-61 (7th Cir. 2003). Under the direct method of proof, a plaintiff must show through the

preponderance of direct and/or circumstantial evidence that the employer's decision to take an adverse job action against the plaintiff was motivated by an unlawful purpose, such as race or national origin. *Id.* at 1061.

The indirect method provides a burden-shifting framework in which a plaintiff who establishes a prima facie case enjoys a presumption of discrimination which requires the defendant to articulate a legitimate non-discriminatory reason for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Once the defendant does so, the framework drops away, and the plaintiff is faced with showing that the articulated reason is a pretext for discrimination; that is, the plaintiff must meet his or her ultimate burden of showing that there is evidence from which a reasonable jury could find that race (or whatever prohibited characteristic is involved) was a determining factor, in the sense that the employer would not have taken the action it did but for a motive to discriminate against the employee based on the prohibited characteristic. *Harvey v. Office of Banks and Real Estate*, 377 F.3d 698, 708 (7th Cir. 2004); *Nawrot v. CPC Int'l*, 277 F.3d 896, 905-06 (7th Cir. 2002). *Dale v. Chi. Tribune Co.,* 797 F.2d 458, 464 (7th Cir. 1986). At this point the direct and indirect methods merge, and any inference of discrimination that arises from the burden-shifting framework is simply a part of the circumstantial evidence to be considered on the ultimate issue. *Huff v. UARCO Inc.,* 122 F.3d 374, 380 (7th Cir. 1997); *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994). Jean-Baptiste opposes K-Z's motion for summary judgment, arguing

that he has both direct and circumstantial evidence of discrimination, and using both the direct and indirect method.

*(a) Direct method*

As explained above, the direct method utilizes both direct and circumstantial evidence that goes straight to the issue of intent. Direct evidence of discrimination is, essentially, an acknowledgment of discriminatory intent by the defendant or its agents, without reliance on inference or presumption, and is difficult to come by. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) ("employers usually are careful not to offer smoking gun remarks"); *see also Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001); *Troupe*, 20 F.3d at 736; *Mojica v. Gannett Co.*, 7 F.3d 552, 561 (7th Cir. 1993). By way of example, the statement "I fired Judy because she was an old woman" proves intentional discrimination against Judy based on her age; thus it is direct evidence. *Gorence*, 242 F.3d at 762. In contrast, the statement "Old women are hard to deal with," without more, does not prove intentional discrimination against Judy based on her age, and thus it is circumstantial evidence. *Id.*; *see also Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003) ("Direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.") (citation and internal quotation marks omitted).

Arguing that he has direct evidence that K-Z discharged him because of his race and national origin, Jean-Baptiste points to the deposition testimony of the lamination

department's group leader, Helmuth, that he and unspecified others in his work group often told "black jokes . . . Mexican jokes . . . Amish jokes . . . Polish jokes" in the workplace. (Helmuth Dep. 17-18.) However, Helmuth's admission is not direct, but circumstantial evidence because an inference is required to prove intentional discrimination. Thus, it is part of the circumstantial case that Jean-Baptiste argues as proof of discriminatory discharge.

The Court of Appeals for the Seventh Circuit has identified three types of circumstantial evidence: (1) "suspicious timing, ambiguous statements, oral or written, behavior toward or comments directed at other employees in the protected group, and other bits and pieces . . . none conclusive in itself but together composing a convincing mosaic . . . from which an inference of discriminatory intent might be drawn," *Troupe*, 20 F.3d at 737; *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004); (2) evidence that similarly situated employees outside of the plaintiff's protected group received "systematically better treatment," *Troupe*, 20 F.3d at 736; and (3) evidence that the plaintiff was qualified for the job, but was replaced by or passed over for a person outside plaintiff's protected group, and that the employer's stated reason for the disparate treatment was phony (i.e., pretextual). *Id*.[1] "Each type of evidence is sufficient

---

[1] As noted above, this is a description of the way the case may be circumstantially proved to a jury. In the context of determining whether a defendant is entitled to summary judgment, the third type of circumstantial evidence describes the indirect, burden-shifting method of analyzing the case: "[T]he Supreme Court established the burden shifting approach as a means of evaluating indirect evidence of discrimination at the summary judgment stage." *Robin*, 200 F.3d at 1088; *see also Mattenson v. Baxter Healthcare Corp.*, 438 F.3d 763, 767 (7th Cir. 2006) ("The judge on his

by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Id.* Here, Jean-Baptiste presents circumstantial evidence of the first ("convincing mosaic") and third (pretext) types, both of which are addressed below.

Under the direct method of proof, for a reasonable jury to infer intentional discrimination by a decision-maker from a mosaic of circumstantial evidence of the first type, "that circumstantial evidence . . . must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir. 2003). Accordingly, racial epithets, slurs and derogatory remarks made by decision-makers themselves can amount to circumstantial evidence of intentional discrimination when such remarks are made "(1) around the time of, and (2) in reference to, the adverse employment action complained of." *Hunt v. City of Markham, Ill.*, 219 F.3d 649, 652-53 (7th Cir. 2000) (citations omitted). On the other hand, the fact that an employee who was not involved in the allegedly discriminatory decision expresses racial or national origin animus towards the plaintiff through derogatory remarks "is not evidence that the *decision* had a discriminatory motivation." *Id.* at 652 (emphasis in original).

Here, Jean-Baptiste attempts to compose a "convincing mosaic" of circumstantial evidence of intentional discrimination by presenting several pieces of evidence around

---

own initiative gave a McDonnell Douglas instruction despite tireless repetition by appellate courts that the burden-shifting formula of that case is not intended for the guidance of jurors; it is intended for the guidance of the judge when asked to resolve a case on summary judgment."); *Huff,* 122 F.3d at 380.

a centerpiece: a work environment purportedly rife with joke-telling based on race and national origin. Specifically, Jean-Baptiste argues that group leader Helmuth revealed his discriminatory animus when he testified in his deposition that he frequently told racial and national origin jokes at work and tolerated such joke-telling by other employees in the lamination department. (Pl.'s Resp. 5-8.) Further, Jean-Baptiste alleges that his supervisor, Helvey, revealed his discriminatory animus by not only tolerating the derogatory joke-telling at work, but by "refus[ing] to hear about [Jean-Baptiste's] complaints about the harassment and repeatedly turn[ing] his back on [Jean-Baptiste]." (Pl.'s Resp. 6.)

To bolster his allegation that Helvey was biased towards him, Jean-Baptiste argues that Helvey fired the only black person he hired (Jean-Baptiste), and then attempted to mask his racial animus by hiring another black person six weeks before his deposition in this case. (Pl.'s Resp. 6.) Further, Jean-Baptiste argues that compliance manager Delbert Miller's investigation of his complaint alleging discrimination was a sham because Miller failed to discover what group leader Helmuth admitted in his deposition about rampant joke-telling in the lamination department. (Pl.'s Resp. 6-7.) Finally, Jean-Baptiste alleges that unlike other new employees, he was not introduced to his co-workers or given orientation, and that when he had performance problems, he was not provided any re-training. (Pl.'s Resp. 6-7.)

Evidence that Jean-Baptiste's co-workers uttered racial epithets, slurs, or jokes does not contribute to a mosaic that directly points to a discriminatory reason for his

discharge, because his co-workers played no role in making or influencing the decision to fire him; only Helvey and Helmuth did. *Swanson v. Leggett & Platt, Inc.*, 154 F.3d 730, 733 (7th Cir. 1998) (noting that "[o]nly evidence on the attitudes of the employees involved in the decision to fire the plaintiffs is relevant"). As to those two decision-makers, Jean-Baptiste does not allege that Helvey told racial jokes, but Helmuth did admit to telling racial jokes in the workplace (Helmuth Dep. 17-20) and testified that racial joke-telling about numerous races and nationalities was prevalent in the lamination department since early 2002, two years before Jean-Baptiste was hired by K-Z. (Helmuth Dep. 2, 17, 19.)

However, because Jean-Baptiste's termination was effectuated by multiple decision-makers, Jean-Baptise may not rely on evidence of just one decision-maker's animus alone. In *Cerutti*, the Seventh Circuit found that, although the plaintiffs had presented evidence tending to show prejudicial animus as to a few members of a decision-making committee, that evidence was "not enough to establish the convincing mosaic of circumstantial evidence needed for the plaintiffs to prevail under the direct method of proof. To do so, the plaintiffs needed to present evidence from which a reasonable jury could infer that Zdunich and Biehle's prejudicial views influenced their fellow panel members to such a degree that it resulted in their being terminated." 349 F.3d at 1066. Jean-Baptiste has not identified evidence that would suggest that Helmuth's input so influenced Helvey that any animus on Helmuth's part could be found to be the cause of Jean-Baptiste's discharge.

21

Moreover, because Helvey was the one who actually hired Jean-Baptiste, the court affords Helvey the "same-actor inference" of nondiscrimination appropriate in Title VII cases when the same individual both hired and fired the plaintiff; this inference is based on the common-sense notion that someone who disliked or intended to discriminate against a person would probably not initially hire that person. *Steinhauer v. DeGolier*, 359 F.3d 481, 488 (7th Cir. 2004) (finding that "it is unreasonable to infer that [plaintiff's supervisors] decided to terminate [plaintiff] based on his sex since they had just decided to hire him notwithstanding his sex"). "The same hirer/firer inference has strong presumptive value." *EEOC v. Our Lady of the Resurrection Med. Ctr.*, 77 F.3d 145, 152 (7th Cir. 1996) (approving the district court's use of the same-actor inference, along with other factors, to find non-discrimination based on race). That Helvey fired the first black person he hired is clearly insufficient to overcome this presumption and establish animus because Helvey "could have refused to hire [Jean-Baptiste] in the first place." *Id*.

Another piece that Jean-Baptiste argues adds to the mosaic is K-Z's failure to provide adequate orientation or training. However, his evidentiary showing on those issues is extremely weak, based solely on Helvey's testimony. (Pl.'s LOCAL R. 56.1(a) Statement of Genuine Issues 3.) Helvey testified that initial training for a new employee consists of placing the employee in a team alongside an experienced worker, who trains them for a day. (Helvey Dep. 47-48.) Jean-Baptiste does not deny that he was placed in a team with an experienced worker. Jean-Baptiste provides no other evidence of K-Z's

training practices. Thus, these facts do not support an inference of discrimination and do not contribute to the mosaic.

The only remaining alleged discriminatory conduct on Helvey's part is the fact that Helvey turned his back on Jean-Baptiste when Jean-Baptiste complained. Viewed in isolation, this conduct is not sufficient to overcome the strong "same-actor" presumption. Viewed along with all of the other circumstantial evidence discussed above, the court believes there is still simply not a "convincing mosaic" bearing directly in the issue of a discriminatory animus.

This does not necessarily mean, however, that this evidence has no probative value in the case whatsoever. Assuming that Jean-Baptiste has evidence of the third circumstantial type sufficient to withstand summary judgment—in other words, that he has used the indirect method to show that there is a triable issue of fact—this evidence may be relevant to the larger showing. As stated above, any of the three types of circumstantial evidence can be used together. *Troupe*, 20 F.3d at 736; *see also Grimm v. Alro Steel Corp.*, 410 F.3d 383, 385 (7th Cir. 2005) ("employee can also use the indirect burden-shifting approach set out in [McDonnell Douglas], proving discrimination 'by constructing a 'convincing mosaic' of circumstantial evidence'") (citations omitted); *Robin*, 200 F.3d at 1090 ("whether the evidence presented is characterized as 'indirect' evidence or 'mosaic' evidence, very often the best way to evaluate the plaintiff's case at the summary judgment stage" is to use *McDonnell Douglas* methodology). Thus, whether it is properly viewed as a third category of circumstantial evidence in a direct

case, or merely as an analytical overlay on all of the circumstantial evidence, the court now turns to Jean-Baptiste's showing using the *McDonnell Douglas* indirect method. *Cf. Huff*, 122 F.3d at 380 ("The third type of circumstantial evidence in a direct case is substantially the same as the evidence required in a so-called indirect or *McDonnell Douglas* case, which we will analyze separately").

*(b) Indirect burden-shifting method*

Under the three-step indirect burden-shifting method set forth in *McDonnell Douglas*, an employee must first establish a prima facie case. *Hong v. Children's Mem. Hosp.*, 993 F.2d 1257, 1261 (7th Cir. 1993). This establishes a presumption of discrimination and the burden shifts to the employer to articulate a valid and nondiscriminatory reason for the dismissal. *McDonnell Douglas*, 411 U.S. at 802. If the employer discharges its burden of production by rebutting the employee's prima facie case, the employee then must show that the employer's proffered reason for the dismissal was false and only a pretext for discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993). The employee always bears the ultimate burden of proving that he or she was the victim of intentionally discriminatory conduct by the employer. *Id.*

To make out a prima facie case, Jean-Baptiste must show that: (1) he belongs to a protected class; (2) his performance met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) other similarly situated employees not

in his protected class received more favorable treatment.[2] *Brummet v. Sinclair Broad. Group Inc.,* 414 F.3d 686, 692 (7th Cir. 2005). Jean-Baptiste bears a low burden at this stage. *See Leffel v. Valley Fin. Servs.,* 113 F.3d 787, 793 (7th Cir. 1997) (holding that the plaintiff only needs to present adequate evidence to create an inference that the adverse employment decision was based on an illegal criterion). The parties do not dispute that Jean-Baptiste meets the first and third elements, but do dispute whether he meets the second and fourth elements. The court first addresses the second element.

In the context of a prima facie case, a court may determine that an individual is performing a job well enough to meet an employer's legitimate expectations based solely upon the employee's testimony concerning the quality of his work. *Williams v. Williams,* 856 F. 2d 920, 923 (7th Cir. 1988); *see also Oates v. Discovery Zone,* 116 F.3d 1161, 1171-72 (7th Cir. 1997) (stating that in certain circumstances, "a determination that an individual is performing a job well enough to meet an employer's legitimate expectations, when made in the context of a prima facie case, may be based solely upon the employee's testimony concerning the quality of his work"). Here, Jean-Baptiste maintains that he was performing satisfactorily. More to the point, he testified in his deposition that even when Helvey fired him, Helvey told him he had been doing a good

---

[2] This Circuit has employed various formulations of the fourth element, depending upon the facts of a case. *Mills v. First Fed. Sav. & Loan Ass'n,* 83 F.3d 833, 843 n.6 (7th Cir. 1996); *Gadsby v. Norwalk Furniture Corp.,* 71 F.3d 1324, 1331 (7th Cir. 1995). The court uses the "treated less favorably" standard for this case because Jean-Baptiste was not replaced by a new employee. Instead, his responsibilities were absorbed by Pearson or by other employees.

job. (Jean-Baptiste Dep. 88-89.) Accordingly, the court finds that Jean-Baptiste has made a sufficient showing on the second element.

As to the final element of the prima facie case—whether another similarly situated employee outside Jean-Baptiste's protected class received more favorable treatment—Baptiste may demonstrate that another employee is "similarly situated" to him by "show[ing] that there is someone who is directly comparable . . . in all material respects." *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002); *see also Greer v. Bd. of Educ. of Chi., Ill.*, 267 F.3d 723, 728 (7th Cir. 2001). To determine whether two employees are similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000). Furthermore, "in disciplinary cases—in which a plaintiff claims that [the plaintiff] was disciplined by [the plaintiff's] employer more harshly than a similarly situated employee based on some prohibited reason—the plaintiff must show that [he] is similarly situated with respect to performance, qualifications, and conduct." *Id.* This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 617-18. But an employee need not show complete identity in comparing himself to the better treated employee; the employee simply must show substantial similarity. *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005) (holding that the law is not so narrow as to require exactly the same

infraction; the other employees must have engaged in similar—not identical—conduct to qualify as similarly situated).

Assuming as true all facts alleged by Jean-Baptiste, he has produced sufficient evidence to show that he and his co-worker, Wayne Miller, were similarly situated. Helvey and Helmuth supervised both Jean-Baptiste and Wayne. Wayne and Jean-Baptiste worked in the lamination department, belonged to the same work group, performed substantially similar work, and were subjected to the same standards. In addition, on April 8, 2004, both Wayne and Jean-Baptiste were allegedly warned by Helvey to improve their work performance. These facts are sufficient to meet the "similarly situated" element. Thus, Jean-Baptiste has made a sufficient showing on the fourth element, and has established a *McDonnell Douglas* prima facie case. By doing so, he has created a rebuttable presumption that K-Z discriminated against him based on race or national origin.

The burden now shifts to K-Z to articulate legitimate non-discriminatory reasons for terminating Jean-Baptiste and rebut the presumption against it. At this stage, K-Z bears a burden of production, not of proof. *Mills,* 83 F.3d at 845. This "burden is not difficult to satisfy." *Id*. An employer need only produce admissible evidence from which a fact-finder may reasonably conclude that the employment decision was not motivated by discriminatory animus. *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 257 (1981); *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 827 (7th Cir. 2006) (defendant's burden of production satisfied by identifying admissible evidence). Although this

burden may not be difficult, as an initial matter, the court does not believe that K-Z has even properly articulated a legitimate reason for firing Jean-Baptiste, based upon *admissible* evidence. This alone, in light of Jean-Baptiste having established a prima facie case, is a reason why K-Z's motion for summary judgment must be denied.

To explain, in its Brief in Support of Defendant's Motion for Summary Judgment (docket # 21, Ex. 1 [hereinafter "Defendant's Brief"], at 8), K-Z states that Helvey and Helmuth decided to fire Jean-Baptiste because of "deficiencies in work performance," citing paragraphs 6 and 13 of its Statement of Undisputed Material Facts (docket # 21, Ex. 2 [hereinafter "Defendant's Statement"]), in support. Paragraph 6 of Defendant's Statement, supported by citations to Helmuth's and Helvey's depositions (and an affidavit provided by Delbert Miller, which the court will address shortly), states that on April 8, 2004, Helmuth and Helvey met with Jean-Baptiste to give him a verbal warning to improve his work performance. Even if that meeting occurred,[3] it is not a statement of the reason that Jean-Baptiste was fired.

The second citation for the assertion that Helmuth and Helvey fired Jean-Baptiste because of performance deficiencies, paragraph 13 of Defendant's Statement, in turn cites paragraph 11 of Delbert Miller's affidavit and page 42, line 10 of Helvey's deposition in support. Taking the latter first, that page and line of Helvey's deposition begins with this question:

---

[3] Jean-Baptiste does not deny that a meeting occurred on that date but does have some disagreement as to its substance.

> Could you tell me what was said? Let me back up a minute. This occurred
> on the date of his termination. Was it a meeting between you and him?

Helvey answered: "Yes, and Jason." Obviously, this does not explain Helvey's reason

for terminating Jean-Baptiste.[4]

The citation to Delbert Miller's affidavit has essentially the same problem, and

the affidavit also presents different and larger evidentiary infirmities. In paragraph 11

of the affidavit Miller states only that Helvey and Helmuth met with Jean-Baptiste on

April 20, 2004, told him he was being fired, and explained the reasons why. Like the

citation to Helvey's deposition, this doesn't provide any evidence as to what those

reasons were. On the other hand, paragraphs 9 and 10 of Miller's affidavit, while not

cited in support, state that because another person, Chad Pearson, was returning from

disability leave, the lamination department would be overstaffed by one employee and

"one employee would have to be discharged," so Helvey and Helmuth chose Jean-

Baptiste because he was the "worst performing worker." The evidentiary problem here

is simple. As is made clear in Defendant's Statement, and confirmed on page 56 of

Helvey's deposition testimony, he and Helmuth made the decision to fire Jean-Baptiste

---

[4] Reading on to the next page of the deposition reveals that Helvey does not recall his exact words when he terminated Jean-Baptiste, but told him that he "hadn't, uh, accelerated in his, in his learning, or his work habits, and that I no longer needed him." What Helvey said at the time and his reason for terminating Jean-Baptiste are not necessarily the same thing. In any event, although when deciding summary judgment motions judges don't have to scour the record like pigs hunting for truffles, *Roger Whitmore's Auto. Servs, Inc. v. Lake County, Ill.*, 424 F.3d 659, 664 n.2 (7th Cir. 2005), Helvey's stated reasons for terminating Jean-Baptiste can be discerned by reading his entire deposition, a subject on which more will be said in the text.

without consulting with anyone else at K-Z. Thus, Miller has no personal knowledge of the reasons that Jean-Baptiste was fired, and his affidavit provides no evidentiary support on the issue.

K-Z also mentions the fact that Chad Pearson was scheduled to return to work following a disability leave, without providing further explanation of the significance of this event. (Def's. Br. 8.) Here, K-Z refers to paragraph 10 of Defendant's Statement for support, which is the paragraph stating that one worker would have to be discharged to accommodate Pearson. To support that assertion, paragraph 10 of Defendant's Statement relies on paragraph 10 of Miller's affidavit and on Jean-Baptiste's deposition testimony, where Jean-Baptiste stated that Helvey told him about Pearson when he was fired. As explained above, Miller has no personal knowledge why Jean-Baptiste was chosen for termination by Helvey and Helmuth, and obviously, neither does Jean-Baptiste. In short, K-Z has not provided an explanation based on admissible evidence of a legitimate reason for discharging Jean-Baptiste.

If the court reads all of Helvey's and Helmuth's deposition testimony to find out their stated reasons for discharging Jean-Baptiste, a legitimate nondiscriminatory reason emerges. The court can also simply assume that Miller does have personal knowledge that someone would have to be discharged to accommodate Pearson's return. Even doing so, K-Z would not prevail on summary judgment because the court must consider whether Jean-Baptiste has identified evidence from which a trier of fact could consider these reasons to be a pretext for discrimination. The court believes that Jean-

Baptiste's evidence of pretext, viewed in light of the circumstantial evidence as a whole, weighs in favor of denying the motion for summary judgment.

In his deposition Helvey answered "absolutely" when asked whether all of the reasons for discharging Jean-Baptiste were performance-related, after earlier in his deposition describing what he saw as Jean-Baptiste's deficiencies. (Helvey Dep. 57.) When asked the follow-up question whether the discharge was in any way related to Pearson's return, Helvey answered: "Yes, also. So—we were, at the time, overstaffed, and I had—Mr. Jean-Baptiste was the weakest link of the production department." (Helvey Dep. 57.) However, during his deposition Helvey also stated that K-Z does not hire temporary workers to replace employees who are on disability leave. (Helvey Dep. 39.) Thus, Helvey's explanation can be viewed as internally inconsistent, and inconsistent with Miller's assertion that K-Z had to discharge a person to make room for Miller. In addition, Jean-Baptiste testified in his deposition that Helvey had consistently told him he was doing a good job, even on the day of his discharge, informing him he was being terminated because of Pearson's return. (Jean-Baptiste Dep. 87.) While this is consistent with part of Helvey's and Miller's explanation, it casts doubt on Helvey's assertion that Jean-Baptiste's discharge was "absolutely" performance-related. Taking Helvey's deposition testimony as an articulation of K-Z's legitimate non-discriminatory

reason[5] for discharging Jean-Baptiste,[6] there is evidence that would allow a reasonable jury to find that this explanation is not entirely honest.

The ultimate question, of course, is whether there is evidence that the explanation is a pretext to mask unlawful discrimination. The inconsistencies just described would allow a reasonable jury to disbelieve K-Z and suspect mendacity on its part, which, together with the elements of a prima facie case, can raise an inference of discrimination. *St. Mary's Honor Ctr.,* 509 U.S. at 511. In addition, assuming—as the court must—that Jean-Baptiste's factual allegations are true, the environment he describes was hostile, as is explained further below.

Briefly, on his first day at work, the employees in his work group—who K-Z admits had a lengthy history of telling racial jokes—greeted him by looking at him "funny" and laughing at him. (Jean-Baptiste Dep. 52, 53-54.) Later on the first day, another employee broke wind in his face and told him he didn't belong there while the other employees, including Helmuth, laughed at the incident. (Jean-Baptiste Dep. 59-60, 61.) When Jean-Baptiste tried to complain to Helvey, Helvey turned his back and walked away. (Jean-Baptiste Dep. 61.) Also on the first day, and thereafter, the other

---

[5] The court uses reason, in the singular, because a reasonable jury could understand Helvey's deposition testimony, in light of Miller's explanation that someone had to be discharged, to mean that Jean-Baptiste's performance was not so deficient that he would have been fired if Pearson had not been coming back from leave.

[6] Although the decision was made jointly by Helvey and Helmuth, Helmuth stated in his deposition that he participated in the decision only "[a] little bit," discussing Jean-Baptiste's performance with Helvey and agreeing it was not up to par.

employees refused to speak to him or to help him learn how to do his job. (Jean-Baptiste Dep. 55.) About a week later, another employee, David Garcia, made a number of racially-charged remarks (e.g., "black people stink," "black people so stupid," Jean-Baptiste Dep. 63, 71, 87) to Jean-Baptiste—some of which Helvey and Helmuth witnessed—and again Helvey turned his back when Jean-Baptiste tried to complain to him. (Jean-Baptiste Dep. 67, 69.) From that point on, Garcia called Jean-Baptiste names almost every day, in front of the other employees, Helmuth and Helvey, all of whom would laugh at him. (Jean-Baptiste Dep. 70, 71.) Helvey himself admits that for the first two weeks on the job Jean-Baptiste had an enthusiastic attitude, describing him as a "go-getter," but then, for a reason that Helvey states he does not know, Jean-Baptiste's attitude became poor. (Helvey Dep. 41.)

A reasonable jury could infer that the reason that Jean-Baptiste's attitude suddenly changed was the constant harassment he alleges that he suffered at the hands of his co-employees without Helvey or Helmuth doing anything to correct the situation, and Helvey turning his back when Jean-Baptiste tried to complain. A reasonable jury could easily conclude that Helvey is being truthful, and Jean-Baptiste was discharged because of poor performance. But a reasonable jury could also find that, even if Helvey did not himself harbor any racial animosity, he arrived at the conclusion that the employees of the lamination department were refusing to accept Jean-Baptiste because of his race and/or national origin, and with Pearson returning to work, Jean-Baptiste was expendable. Thus, there are issues of fact in this case for a jury to sort out, and K-Z

cannot be granted summary judgment on the issue of whether Jean-Baptiste's discharge was unlawful.

### 2. Hostile Work Environment Claim

The court now addresses Jean-Baptiste's racial and national origin harassment claim, which is based on the "hostile work environment" theory. Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993). To prevail on a hostile work environment claim, Jean-Baptiste bears the burden of persuading a reasonable jury, by a preponderance of the evidence, that: (1) he was subjected to unwelcome harassment; (2) the harassment was based on his race or national origin; (3) the harassment was severe or pervasive enough to alter the conditions of his employment and create a hostile or abusive working environment; and (4) there is a basis for employer liability. *See Beamon v. Marshall & Ilsley Trust Co.,* 411 F.3d 854, 863 (7th Cir. 2005). K-Z points to specific portions of the record and argues that Jean-Baptiste's evidence is insufficient to establish any of the four elements of the legal test; thus, according to K-Z, no genuine issue of material fact exists for trial. Because Jean-Baptiste bears the burden of persuasion at trial, K-Z is entitled to summary judgment if Jean-Baptiste fails to present sufficient evidence from which a reasonable jury could conclude in his favor as to each element of the test.

K-Z has not met its burden on this summary judgment motion to show that no reasonable jury could find that Jean-Baptiste has prevailed on the first two elements of the test. Workplace harassment "need not be *explicitly* racial in order to be probative of a hostile environment." *Id.* (emphasis in original). As long as the alleged harassment is "sufficiently connected to race," it may reasonably be construed as being motivated by the harasser's hostility to the plaintiff's race or national origin. *Id.* (internal quotation marks omitted); *Shanoff v. Ill. Dep't of Human Servs.,* 258 F.3d 696, 704 (7th Cir. 2001) (noting that the plaintiff may point to any "facially discriminatory remarks, as well as any of [the harasser's] remarks and behavior that may reasonably be construed as being motivated by . . . hostility to [the plaintiff's] race or [national origin]"). In other words, the conduct at issue must have a racial or national origin character or purpose. *See Hardin v. S.C. Johnson & Son, Inc.,* 167 F.3d 340, 345 (7th Cir. 1999).

Here, Jean-Baptiste testified in his deposition that David Garcia, a co-worker, made derogatory remarks to him on each working day of the last two weeks of his employment at K-Z, including "Haitian," "stupid," "Haitian people took boat [sic] to come to United States to find food," "black," "black people stink," "go home black man," and "we don't want you around here because you're black." (Jean-Baptiste Dep. 58, 70-71.) Next, Jean-Baptiste alleges that one morning Garcia came up to him, jabbed a finger two inches away from his face, and said, "Black people so stupid, you can't do your job." (Jean-Baptiste Dep. 63.) In addition, on at least three occasions, Garcia allegedly dropped work product on Jean-Baptiste, or hit him with his elbow, but

immediately apologized to him afterwards. (Jean-Baptiste Dep. 75, 78.) Jean-Baptiste

testified that he felt physically threatened by Garcia's behavior. (Jean-Baptiste Dep. 75.)

Further, Jean-Baptiste alleges that on his first day at work, while he was bending over to

pick up something, his co-worker Wayne passed wind on his face and said, "That's not

your place. You shouldn't be here anyway." (Jean-Baptiste Dep. 56-57, 59-60.) Finally,

Jean-Baptiste also alleges that from his first day at work, all his co-workers laughed at

him, looked at him in a "funny" way, and never talked to him, despite his attempts to

converse with them. (Jean-Baptiste Dep. 42-43, 53-54, 56.)

From the aggregate of these derogatory remarks and non-verbal acts, a

reasonable jury could conclude that Jean-Baptiste was subjected to unwelcome

harassment and that the harassment was based on his race and national origin. *See Berry*

*v. Delta Airlines, Inc.*, 260 F.3d 803, 810-11 (7th Cir. 2001) (explaining that "[c]ourts

should avoid disaggregating a hostile work environment claim, dividing conduct into

instances of [racial or national origin-based] conduct and instances of unequal

treatment, then discounting the latter category of conduct, thereby robbing instances of

[racial or national origin-based] harassment of their cumulative effect") (internal

quotation marks omitted). Thus, K-Z has not met its burden with regard to the first and

second elements of plaintiff's hostile environment claim.

The court now turns to the third– "severe or pervasive" –element of the test. A

hostile work environment is one that is both objectively and subjectively offensive.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). A workplace is subjectively

offensive when the plaintiff actually perceives it as such. *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 807 (7th Cir. 2000). A workplace is objectively offensive when a reasonable person would find it hostile or abusive. *Harris*, 510 U.S. at 21. The standard for determining whether conduct is sufficiently severe or pervasive to create an objectively offensive work environment "takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." *Id.* at 23. Thus, relatively isolated instances of non-severe misconduct are not probative of an objectively offensive work environment. *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993). To determine whether a workplace is objectively hostile, the court must look at several factors, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Ultimately, however, none of the factors are mandatory, and a court must consider all of the circumstances to identify a hostile work environment. *Id.*

The Court of Appeals for the Seventh Circuit has held that pervasiveness and severity "are, to a certain degree, inversely related; a sufficiently severe episode may occur as rarely as once, while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 951 (7th Cir. 2005) (internal quotation marks omitted). Importantly, "[w]hile there is no magic number of slurs that indicate a hostile work environment . . . an unambiguously

racial [or national origin] epithet falls on the more severe end of the spectrum." *Id.* at 950 (internal quotation marks omitted).

Here, Jean-Baptiste testified that Garcia abused him with racial epithets and national origin slurs such as "black people stink" and "Haitian people took boat [sic] to come to United States to find food." A reasonable person could find such unambiguous racial epithets or national origin slurs not merely offensive or innocuous, but humiliating and pointedly discriminatory. Thus, these explicit racial epithets and national origin slurs fall on the more severe end of the spectrum. *See Shanoff,* 258 F.3d at 705-06 (finding an objectively hostile work environment where employee was subjected to six "rather severe" instances of harassment in a four month period, including three remarks (one each month) such as "I hate everything you are," and "I know how to put you Jews in your place"); *Cerros,* 398 F.3d at 951 ("A reasonable Puerto Rican would find a workplace in which her boss repeatedly called her a 'dumb spic' and told her that she should stay home, go on welfare, and collect food stamps like the rest of the 'spics' to be hostile.").

Jean-Baptiste also alleges that Garcia hurled these derogatory racial epithets and national origin slurs at him on each working day of the last two weeks of his employment at K-Z. The alleged frequency of these derogatory remarks suffices to show that they were pervasive. *See Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1456 (7th Cir. 1994) (five explicitly sexual comments over a two-and-a-half year period and assertions of daily abuse found sufficient evidence of pervasive conduct to defeat a

motion for summary judgment). Additionally, Jean-Baptiste points out that Helvey testified that joke-telling based on race and national origin was prevalent in the workplace, although Jean-Baptiste does not allege that he witnessed or was made the subject of joke-telling. Such "second-hand" harassment, although less objectionable than harassment directed at the plaintiff, is still relevant to the hostile work environment inquiry. *Moser v. Ind. Dep't of Corrs.*, 406 F.3d 895, 903 (7th Cir. 2005). In sum, taking into account all the circumstances according to Jean-Baptiste's version of the facts, sufficient evidence exists in the record from which a reasonable jury could conclude that the harassment was severe or pervasive enough to alter the conditions of Jean-Baptiste's employment and create an objectively and subjectively hostile working environment.

The court now addresses the fourth element of the test: "employer liability." Under Title VII, an employer's liability for hostile work environment harassment claims turns upon whether the alleged harasser is the employee's supervisor or merely a co-worker. *Cooper-Schutt v. Visteon Auto. Sys.*, 361 F. 3d 421, 426 (7th Cir. 2004). If the harasser is a supervisor, the employer may be held vicariously liable. *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher,* 524 U.S. at 780. On the other hand, if the harasser is a co-worker, the plaintiff must prove that the employer was negligent "either in discovering or remedying the harassment." *Perry v. Harris Chernin, Inc.,* 126 F.3d 1010, 1013 (7th Cir. 1997). In this case, Jean-Baptiste complains of co-worker, not supervisory, harassment. (Compl. ¶¶ 23, 30; Pl.'s Resp. 11-18.)

It is well settled in this circuit that an employer satisfies its legal duty in co-worker harassment claims "if it takes reasonable steps to discover and rectify acts of . . . harassment of its employees." *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1032 (7th Cir. 1998). Accordingly, in a co-worker harassment case, "notice or knowledge of the harassment is a prerequisite for liability." *Id*. at 1035; *see also Hall v. Bodine Elec. Co.,* 276 F.3d 345, 356 (7th Cir. 2002) (citing *Parkins*, 163 F.3d at 1035) ("Title VII neither requires nor expects the management of a company to be aware of every impropriety committed by every low-level employee."). "Generally, we do not consider an employer to be apprised of the harassment unless the employee makes a concerted effort to inform the employer that a problem exists. However, we could charge an employer with constructive notice where the harassment is sufficiently obvious." *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 506 (7th Cir. 2004) (internal quotation marks and citations omitted). "With respect to the extent of the notice given to an employer, a plaintiff cannot withstand summary judgment without presenting evidence that she gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed." *Parkins,* 163 F.3d at 1035 (internal quotation marks omitted).

In assessing whether an employer had notice of harassment, the court must "first determine whether the employer designated a channel for complaints of harassment." *Id*. "Where an employer designates a point person to accept complaints, this person becomes the natural channel for the making and forwarding of complaints, and

complainants can be expected to utilize it in the normal case." *Hall,* 276 F.3d at 356

(internal quotation marks omitted). In this case, the parties do not dispute that K-Z had

established a channel for receiving complaints of harassment. When Jean-Baptiste was

employed at K-Z, its employee handbook plainly stated, in pertinent part:

> Any K-Z person who experiences or observes conduct believed to constitute
> harassment in violation of this policy should tell the harasser that the
> behavior is offensive and that it must stop. If you are unable or
> uncomfortable confronting the harasser or unsuccessful in convincing him
> or her to stop, immediately report the incident to your Plant Manager, the
> Compliance Manager or the Human Resource Manager so the incident may
> be fairly investigated and any prompt remedial action may be taken.

(K-Z Employee Handbook 12.) Jean-Baptiste testified that he received a copy of the

employee handbook on March 25, 2004, the first day of his employment. (Jean-Baptiste

Dep. 96; Receipt for Employee Handbook, Def.'s Mot. Summ. J., Ex. 11.) Jean-Baptiste

also does not deny that he failed to complain to any of the three "point persons"

designated by K-Z to receive harassment complaints - Elvey Miller, the Plant Manager;

Sue Thomas, the Human Resource Manager; or Delbert Miller, the Compliance

Manager – about the alleged harassment before he was discharged on April 20, 2004.

(Jean-Baptiste Dep. 81, 84, 84-85.) Jean-Baptiste alleges that he complained to Miller a

few minutes after Helvey fired him. (Jean-Baptiste Dep. 84-85.)

   Because it appears that Jean-Baptiste delayed using the designated mechanism

for complaints, the court must determine whether Jean-Baptiste "reported the alleged

harassment to anyone who had the authority to deal with the harassment or at least 'to

someone who could reasonably be expected to refer the complaint up the ladder to the

employee authorized to act on it.'" *Parkins,* 163 F.3d at 1037 (quoting *Young v. Bayer Corp.,* 123 F.3d 672, 675 (7th Cir. 1997)) (proceeding to question of authority of person actually complained to, having found that plaintiff had not made timely use of properly established channels for complaints); *Jarvis v. Sigmatron Int'l Inc.,* 223 F. Supp. 2d 981, 987 (N.D. Ill. 2002) (sufficient to notify designated point person or someone reasonably believed to be authorized to receive and forward complaints); *Mingo v. Roadway Express, Inc.,* 135 F. Supp. 2d 884, 897 (N.D. Ill. 2001) ("Moreover, even it the court accepted as true that Mingo failed to use either of Roadway's procedures for reporting sexual harassment complaints, that would not end the court's inquiry. The court must determine whether she reported the alleged harassment to someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it.") (internal quotation marks omitted); *cf. Cerros,* 398 F.3d at 952 (in context of affirmative defense to supervisory harassment, "[t]he relevant inquiry is therefore whether the employee adequately alerted her employer to the harassment, . . . not whether she followed the letter of the reporting procedures set out in the employer's harassment policy.").

Jean-Baptiste maintains that he complained more than once to Helvey about Wayne and Garcia's conduct, only to receive Helvey's "turned back" in response. (Jean-Baptiste Dep. 61, 67-68.) Jean-Baptiste also testified that Helvey was present when Garcia and Wayne made derogatory comments. (Jean-Baptiste Dep. 61, 67.) Helvey was the person who hired and fired Jean-Baptiste; Helvey also was the one to call Jean-

Baptiste (and other employees) in to discuss work performance issues. Factors such as these are sufficient to establish that Jean-Baptiste could have reasonably expected that Helvey had the authority to deal with harassment and harassers or was at least someone who could be expected to forward a message up the chain of command. *Cf. Parkins*, 163 F.3d at 1037 (complaint to someone who "lacked the authority to correct the harassment, had no authority to address grievances, and no authority to terminate or discipline the harassers" and "exercised no disciplinary authority and was not responsible for addressing disciplinary problems" was insufficient to put employer on notice). For this reason, there exists a genuine issue of material fact as to whether K-Z had notice of the allegedly hostile environment and, in the face of such notice, did not act reasonably to rectify the situation. In sum, because there are issues of fact remaining for trial as to each of the four elements of Jean-Baptiste's harassment claim, summary judgment in K-Z's favor is not proper.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (docket # 21) is **DENIED**. Defendant's motion to strike (docket # 24) is also **DENIED.**

**SO ORDERED.**

ENTER: July 12, 2006

s/James T. Moody
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT